# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH HEALY, TOM O'DRISCOLL, ALAN PORTER, JAMES RYAN, JAMES B. HOWLAND, KARL DIEDE, and JIM TIMOTHY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 11 C 8892 |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 134, FREEMAN ELECTRICAL, INC., GLOBAL EXPERIENCE SPECIALISTS, INC., and METROPOLITAN PIER AND EXPOSITION AUTHORITY, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Joseph Healy,[1] Tom O'Driscoll, Alan Porter, James B. Howland, Karl

Diede, Jim Timothy, and John Ryan, as representatives of a class, have sued

International Brotherhood of Electrical Workers, Local Union No. 134 (the union),

Freeman Electrical, Inc., Global Experience Specialists, Inc. (GES), and the

Metropolitan Pier and Exposition Authority (MPEA). The union has a collective

---

[1] The spelling of Joseph Healy's name varies in the materials that have been submitted to the Court. For instance, the second amended complaint refers to him as "Healey," but plaintiffs' briefs refer to him as "Healy." Because plaintiffs' exhibit I, a request detail report, lists a "Joseph Healy," the Court adopts this spelling of his name. Pls.' Ex. I at 00348, 00360, 00362.

bargaining agreement (CBA) to which Freeman, GES, and MPEA are all subject. The CBA provides that the union is to be the sole and exclusive source of referral of electricians for employment by CBA signatories, and it sets up a hiring-hall procedure to accomplish this. The CBA also prohibits employers from loaning or borrowing employees, a provision likely aimed at preventing employers from end-running the hiring hall referral process.

Plaintiffs contend that for a period starting in 2011, Freeman and GES, while performing work at the Chicago convention center McCormick Place, obtained electricians not from the union's hiring hall but rather from a pool of electricians that MPEA had more or less informally established, consisting of workers who were purportedly experienced in performing work at McCormick Place. (Plaintiffs contend that this pool actually was established by inside connections and favoritism, but that contention is not directly at issue on the current motions.) This practice, plaintiffs contend, constituted a breach of the CBA's term establishing the union as the exclusive source of electrician referrals as well as its prohibition against loaning or borrowing employees. Plaintiffs also contend that the union, by agreeing to this arrangement, breached its duty of fair representation to the plaintiffs, who were laid off by Freeman and GES once the challenged arrangement went into effect.

Plaintiffs have moved for summary judgment on these claims, and the union and Freeman have cross-moved for summary judgment.[2] For the reasons stated below, the Court denies both sides' motions but makes certain factual findings pursuant to Federal Rule of Civil Procedure 56(g).

_____

[2] GES also cross-moved for summary judgment, but it reached a settlement with the plaintiffs while the summary judgment motions were pending.

**Background**

**A.      Hiring procedures before the MPEA Act amendments**

Freeman, GES, and MPEA are all parties to a CBA between the union and the Electrical Contractors' Association of the City of Chicago.  The CBA is not limited to work for contractors at McCormick Place; it also covers, for example, electrical contractors that perform work in the construction industry.

The CBA states that "[t]he Union shall be the sole and exclusive source of referral of applicants for employment" with members of the electrical contractors' association.  Pls.' Ex. E § 4.02.  To this end, the CBA states that "[t]he loaning and borrowing of journeymen between contractors shall not be tolerated."  *Id.* § 2.18.

To ensure that employers who adopt the CBA hire electricians exclusively through the union, the CBA requires them to use a neutral referral procedure.  *Id.* Art. IV.  Under this procedure, unemployed union members sign up on out-of-work lists maintained at the union's hiring hall.  An employer calls the hiring hall for a particular number of electricians for any given job.  The hall then refers that number of electricians to the employer based on the order of names on the out-of-work list.  Employers may also make "specialty" calls to the hiring hall, meaning that they may request electricians who possess a specific skill.  *Id.* § 4.17.

To facilitate the hiring of union members by parties to the CBA, the union has used supplementary written referral procedures.  These procedures permit referral of electricians for "short calls" and "long calls," with short calls consisting of jobs lasting ten days or less (excluding weekends and holidays) and long calls consisting of jobs exceeding ten days.  Pls.' Ex. F at 00467.

MPEA is a local governmental entity that owns and operates McCormick Place, a convention center in Chicago. Historically, MPEA provided all of the electrical services at McCormick Place. Unlike other parties to the CBA, MPEA eschewed the use of short or long calls in favor of "tradeshow calls," a term used for jobs lasting the length of a specific show at McCormick Place. The CBA and the supplementary referral procedures do not mention tradeshow calls. But plaintiffs and defendants agree that the union has recognized tradeshow calls for many years.

There is a group of electricians called the "McCormick Place pool." It consists of electricians who were referred to the MPEA on a tradeshow call but were converted by MPEA to long-term employees. Defendants state that MPEA created the McCormick Place pool because "there were times when there were not enough electricians on the out of work list to cover a show" and "many electricians elect to pass up a 'show call' because the nature of electrical work for a trade show is different than electrical work in the regular construction industry." Defs.' Opening Br. at 6-7. Defendants maintain that "not all electricians have the necessary rigging experience or like to work high off of the ground" and that "[e]lectricians were selected for entry into the McCormick Place based upon their experience and performance." *Id.* at 7.

B.    **The MPEA Act amendments**

In 2009, several conventions, exhibition managers, and exhibitors announced that they did not plan to return to McCormick Place because "union labor work rules and electric and food service costs make it uneconomical for the show managers and exhibitors to use McCormick Place as a convention venue . . . ." 70 ILCS 210/5.4(a)(9). In response, Illinois amended the MPEA Act to provide, among other things, that MPEA

4

"shall not serve as the exclusive provider of electrical services" at McCormick Place. 70 ILCS 210/5.4(f)(2).

Following this amendment to the MPEA Act, MPEA entered into "Utility Service Agreements" with Freeman and GES, which allowed those entities to provide certain electrical services at McCormick Place. In November 2010, Freeman and GES also signed letters of assent to the CBA. Pls.' Ex. D. In February 2011, both Freeman and GES began providing electrical services at McCormick Place, competing with MPEA for contracts with vendors. Plaintiffs state that "[d]uring that time, each of the class members was hired from the referral hall by Freeman or GES on a long-term basis (either on a long call or a foreman call)." Pls.' Opening Br. at 6.

Plaintiffs and defendants dispute what happened next. Plaintiffs contend that MPEA decided to withdraw from the business of providing electrical services at McCormick Place because it was unable to compete with Freeman and GES. Plaintiffs also contend, however, that MPEA sought to ensure that well-connected members of the McCormick Place pool would retain their jobs even after MPEA bowed out. According to the defendants, the problem was not that MPEA had trouble competing with Freeman or GES, but rather that the electricians who possessed the skills needed to provide electrical services at McCormick Place were already employed by MPEA as members of the McCormick Place pool. Defendants contend that this left Freeman and GES with a relatively unskilled and inexperienced labor pool. As a result, defendants says, the electricians whom Freeman and GES retained to work at McCormick Place experienced safety and economic problems, including electrical shocks, equipment damage, other accidents, and longer installation times. Defendants argue that these

"disasters" resulted in "more bad publicity for McCormick Place and once again raised the very real possibility that more shows would leave Chicago," prompting the defendants to contemplate ways to better serve the McCormick Place vendors.  Defs.' Opening Br. at 3.

### C.    Alleged subcontracts and joint ventures

Whatever defendants' motivations, the parties agree that the defendants entered into the following arrangements in or about the summer of 2011.  Freeman and GES continued to sell electrical contracting services to McCormick Place vendors pursuant to the MPEA Act amendments, but the actual work was performed by electricians who were members of the McCormick Place pool, who were on MPEA's payroll.  During his deposition, Freeman's director of electrical services admitted that Freeman "exercise[d] control over what those employees would be doing on a day-to-day basis," provided all of the "management supervision" for the pool members, and "decide[d] how many hours those employees would work."  Pls.' Ex. C at 135-36.  Defendants do not dispute this but suggest that this did not constitute supervision of the pool members by Freeman or GES, a duty that defendants say fell to MPEA.  Defs.' Opening Br. at 17.  Another aspect of the arrangement was that MPEA billed Freeman and GES for the work performed by pool members, who as indicated remained on MPEA's payroll.  Although Freeman and GES could dismiss a pool member from a particular job, only MPEA had the authority to permanently discharge the electrician, in other words remove the electrician from the pool.

In June 2011, defendants memorialized the new arrangement in identical "Interpretive Side Letters," one between the union and Freeman and the other between

the union and GES.  The side letters required Freeman and GES "not to perform any electrical work included in the scope of work in the existing Letters of Assent at any location owned, operated or controlled by the MPEA with its own employees . . . without securing the labor through MPEA . . . ."  Pls.' Ex. K at 000036, 0059.

Around the same time, Freeman and GES each entered into an identical agreement with MPEA called "McCormick Place Utility Service Agreements."  These agreements provided, among other things, that MPEA:

> agrees to name ten (10) individuals from the Pool exclusively for Contractor's Work at the Facilities, and Contractor has the first right of call for these individuals.  Contractor shall have the right to call or exclude additional labor by name from the Pool, including without limitations, rejecting any laborer for any non-discriminatory reason. Contractor also has the right to designate all foreman [sic] and work assignments for all electricians selected from the Pool.  Electricians from the Pool may also, at Contractor's sole option, perform Work related to the Facilities at Contractor-owned storage and operational facilities.

Pls.' Ex. L § 2.4.  In other words, MPEA agreed to designate certain pool members for Freeman or GES projects at McCormick Place, leaving Freeman and GES the option of rejecting or accepting pool members on non-discriminatory bases.  Freeman and GES were free to determine who the foreman of any particular project would be and what sort of work each electrician would perform.  MPEA agreed that pool members could work on Freeman or GES projects outside of McCormick Place.  The utility service agreements also stated that Freeman and GES would pay commissions to MPEA based on predetermined percentages of their gross receipts.  *Id.* § 5.2.

Plaintiffs contend that this arrangement bypassed the contractual hiring hall requirements and constituted prohibited loaning and borrowing of employees.  Defendants say the arrangement enabled them to ensure that relatively skilled and

7

experienced electricians worked on McCormick Place shows.  They contend that the arrangement constituted a subcontract permitted by the CBA and did not violate the CBA's prohibition against loaning and borrowing employees.

The CBA contained the following provision regarding subcontracted work:

> The Joint Arbitration Board recognizes that subcontracts can exist between participating electrical contractors.  The Joint Board has agreed upon rules . . . for these subcontractors to follow . . . .  The contractor shall be responsible to provide written notice to the Electrical Joint Arbitration Board of any subcontract with another electrical contractor. . . .  The written notice shall define the type of subcontract i.e., MBE, DBE, WBE, manpower only, manpower and equipment, etc.  This notice will include a defined scope of work, and the area and/or type of work for which the subcontractor is responsible.  The subcontractor will be responsible to supply separate supervision, separate manpower, and separate tools for the Employees working in the area defined by the scope of work.  Upon receipt of written notice, the Joint Arbitration Board will notify the contractor that the subcontract has been approved.  Notification will occur within forty-eight (48) hours of receipt.

Pls.' Ex. E § 2.18.  Defendants concede that they did not follow the rules for subcontract approval laid out in this provision of the CBA.  They argue, however, that an "actual written subcontract was not necessary for this arrangement to be in compliance with the [CBA]."  Defs.' Opening Br. at 17.  Defendants say that the union was already aware that Freeman and GES were going to subcontract the work, and the terms of payment were set forth in the utility service agreements.  *Id.* at 18.  Defendants also contend that Freeman and GES believed that the side letters and utility service agreements comported with the CBA because the union represented that they did.  *Id.* at 20.

The result of these arrangements was that Freeman and GES had to get all of their electricians from MPEA.  In other words, the assignment of electricians to work at McCormick Place via the union's hiring hall came to a stop.  During his deposition, Freeman's director of electrical services admitted that the new arrangement required the

company to lay off all of its electricians. Pls.' Ex. C at 65, 81. Indeed, between August 12, 2011 and the end of September 2011, Freeman and GES laid off all of their electrician employees.

As a result of the layoffs, some former Freeman employees filed grievances, which were converted into a formal grievance before the Electrical Joint Arbitration Board (EJAB). The dismissed workers accused Freeman of violating the CBA's prohibition against loaning and borrowing employees. On October 4, 2011, Freeman issued a response stating that it disputed the grievance, contending it had acted within its rights in entering into the interpretive side letter. After learning that the union had agreed to the interpretive side letter, plaintiffs filed the present action.

In December 2011, after this suit was filed, the union told Freeman and GES that they did not need to abide by the side letters and could resume obtaining employees from the hiring hall. The union also advised Freeman and GES that the only way they could secure McCormick Place pool members was to participate in joint ventures with MPEA on a show-by-show basis. By June 2012, Freeman, GES, and MPEA had memorialized this agreement in new versions of the utility service agreements, which stated that:

> [C]ontractor may opt to use McCormick Place electricians for Contractor Events at Facility by forming a joint venture with [McCormick Place] for a specific Event, subject to the Process for Utility Contractors Utilizing McCormick Place Electricians ("Process"). Contractor is responsible for selecting, managing and supervising the McCormick Place Electricians for a joint venture.

Pls.' Ex. T § 2.4.

The CBA permits the use of joint ventures and identifies certain requirements for forming and implementing them. Specifically, the CBA states that:

9

[e]mployees hired for the joint venture shall be assigned by the Administrator to the individual Participating Employer in the following manner:

(a) Employees will be assigned first to the Participating Employer having the least number of Employees on the joint venture until his Employees on the joint venture are equal in number to those of the Participating Employer having the next lowest number of Employees on the joint venture . . . .

(b) Likewise, any reduction of force on the joint venture job shall be apportioned among the individual Participating Employers in such manner as to retain on the job as nearly as practical an equal number of Employees for each such Participating Employer. . . .

(d) In a MBE, DBE, WBE joint venture job the percentage of Employees will follow the percentage established in the joint venture agreement.

(e) The contractors of a joint venture will provide written notice to the Electrical Joint Arbitration Board of any joint venture in advance of the beginning of the work . . . .

Pls.' Ex. E § 2.19. The defendants concede that they did not provide notice of any of their joint ventures to the EJAB or adhere to the hiring guidelines outlined in the CBA. They argue, however, that the CBA's "requirements for equal hiring and alternating layoffs between employers engaged in joint ventures are not strictly adhered to by those in the electrical industry, and should therefore be interpreted in light of the custom and practice in the electrical industry." Defs.' Opening Br. at 13.

In January 2013, GES offered to hire back the employees whom it had laid off, and Freeman notified MPEA that it would no longer be using McCormick Place pool members to staff its projects. In the first quarter of 2013, MPEA laid off the entire McCormick Place pool.

**D.     This lawsuit**

Plaintiffs originally asserted claims against Freeman, GES, and MPEA for breach of the CBA, against the union for breach of its duty of fair representation, and against MPEA for tortious interference with the CBA.  Plaintiffs also sought a declaratory judgment that the utility service agreements violated the MPEA Act.  On September 4, 2012, the Court dismissed plaintiffs' declaratory judgment claim (count 5) and their claim for tortious interference against MPEA (count 4).  *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, No. 11 C 8892, 2012 WL 3835094, at *9 (N.D. Ill. Sept. 4, 2012). On August 22, 2013, the Court certified pursuant to Federal Rule of Civil Procedure 23(b)(3) a class consisting of all union members who were laid off by Freeman or GES between August 12, 2011 and the end of September 2011.  *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 597 (N.D. Ill. 2013).  The Court appointed all of the named plaintiffs other than Tom O'Driscoll as class representatives.

Plaintiffs have now moved for summary judgment on their claims for breach of the CBA and the duty of fair representation.  The union and Freeman have cross-moved for summary judgment on the same claims.[3]  For the reasons stated below, the Court denies both sides' motions for summary judgment.

**Discussion**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

_____

[3] As discussed earlier, GES also moved for summary judgment, but it reached a settlement with the plaintiff class while the summary judgment motions were under advisement.  The Court preliminarily approved the settlement on July 10, 2014.

> A material fact is one identified by the substantive law as affecting the outcome of the suit. . . . A genuine issue exists with respect to any such material fact, and summary judgment is therefore inappropriate, when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (internal quotation marks omitted).

Plaintiffs' claims for breach of CBA and duty of fair representation arise under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Their suit is referred to "as a hybrid suit because it is comprised of two causes of action that are 'inextricably interdependent.'"  *McLeod v. Arrow Marine Transp. Inc.*, 258 F.3d 608, 613 (7th Cir. 2001) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983)).  "To prevail against either the Company or the Union, the plaintiff must establish both that the Company breached the collective bargaining agreement and that the Union breached its duty of fair representation."  *Bennett v. Local. Union No. 66*, 958 F.2d 1429, 1433 (7th Cir. 1992).  "[N]either claim is viable if the other fails."  *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997).

## A.    Breach of CBA

### 1.    Loaning and borrowing

As stated earlier, plaintiffs contend that Freeman and GES breached the CBA by violating its prohibition against loaning or borrowing employees.  The CBA does not define these terms.  Plaintiffs and defendants offer different methods for ascertaining whether an employer has participated in either.

Plaintiffs cite the common law test adopted by Illinois courts, and used by the Seventh Circuit, to determine in other contexts whether a loaned employee relationship

exists. *Couch v. United States*, 694 F.3d 852, 854-55 (7th Cir. 2012) (assessing whether a truck driver has been loaned to the U.S. Postal Service to determine whether his estate was limited to recovering worker's compensation); *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 384-85, 385 N.E.2d 664, 666-67 (1978) (evaluating whether a driver had been loaned to a paving company to decide whether a victim of an accident involving the driver was limited to recovering worker's compensation); *Gundich v. Emerson–Comstock Co.*, 21 Ill. 2d 117, 122-23, 171 N.E.2d 60, 63 (1960) (assessing whether a crane operator had been loaned to a general contractor to determine whether the contractor was liable for the operator's negligence).

Defendants ask the Court to reject plaintiffs' proposed test because "federal labor law, not state law applies to the construction of a collective bargaining agreement." Defs.' Reply at 13. Defendants cite *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293 (7th Cir. 1992), in support of their argument. *Ooley* says that a court must look to federal labor law to interpret a CBA. *Id.* at 1298, n. 4. This is certainly true as a legal matter, but it begs the question of whether common law regarding loaning and borrowing employees is a relevant source of information for interpreting the particular contractual provision at issue here. It may well be.

The closest thing to an alternate test for whether employees are that defendants offer is a signed declaration by the union's business manager Terry Allen, in which he states that the "loaning and borrowing of employees occurs when an electrician moves from one employer's payroll to another employer's payroll without being referred through [the union's] referral hall." Defs.' Ex. 6 ¶ 6. Though Allen's statement conceivably may be worthy of consideration, it is a unilateral and unsupported interpretation of the CBA's

prohibition. As plaintiffs observe, defendants "do not cite past instances of loaning and borrowing, and certainly none that were arbitrated or ruled upon by the Electrical Joint Arbitration Board." Pls.' Reply at 21.

The lending-and-borrowing prohibition is ambiguous on its face, in that it is reasonably susceptible or more than one meaning. The union and the Electrical Contractors' Association "did not negotiate [the prohibition] in a vacuum," *Bhd. of Maintenance of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 641 (7th Cir. 1997), but in this case neither side has given the Court any information about the term's background or why it was drafted as it was. The prohibition's apparent purpose, as the Court indicated earlier, is to prevent bypassing the neutral hiring hall procedure, but recognition of that purpose does not necessarily provide content for the contractual term. In addition, neither side has offered any evidence, aside from Allen's bare conclusions, regarding the parties' "practice, usage, and custom." *Id.* (internal quotation marks omitted). Parol evidence is admissible in this situation just as it would be in a state-law case involving an ambiguous contract, *see, e.g., Office and Prof'l Emps. Int'l Union, Local 95 v. Wood Cnty. Tel. Co.*, 408 F.3d 314, 316 (7th Cir. 2005), but here none has been offered.

The bottom line is that the contractual prohibition on loaning and borrowing employees is undefined and arguably ambiguous. Thus the Court cannot resolve the interpretation of the prohibition on the current record. Because there are reasonable readings of the term that would support either side's position in the case, summary judgment on this particular point is inappropriate.

## 2. Subcontracts and joint ventures

Defendants contend that even if their arrangement involved loaning and borrowing of electricians, this was done pursuant to subcontracting arrangements and joint ventures, both of which they say the CBA permits. Plaintiffs argue otherwise. They point out that neither the side letters nor the utility service agreements mention the words "subcontract" or "joint venture"; defendants lacked actual subcontracts or agreements setting forth joint ventures; and defendants have not followed the CBA's requirements for either arrangement.

Defendants argue that the fact that all involved were aware of the terms of their subcontract arrangement made it unnecessary for them to draft formal contracts or fulfill the CBA's requirements for them. For example, the CBA requires the contractor in a permissible subcontract arrangement to define the scope of work for which the subcontractor will be responsible. Defendants maintain that "the scope of work is the same for every trade show" and that "McCormick Place and its electricians knew exactly what needed to be done for each show and the timeframe in which the work needed to be completed." Defs.' Opening Br. at 18. Further, defendants argue, "the terms and conditions of the payments to be made by Freeman and GES to McCormick Place were set forth in the [utility service agreements] just as they would be in a subcontract." *Id.*

That is all well and good, but the CBA's requirements regarding subcontracting are not the least bit ambiguous, and the arrangements in question indisputably did not meet those requirements. The selfsame provision of the CBA that says that loaning and borrowing of electricians "shall not be tolerated" goes on to say that the Electrical Joint Arbitration Board "has agreed upon rules, as stated herein, for . . . subcontractors to

follow" and that subcontracting arrangements other than those involving minority participation requirements "will be subject to all of the following," followed by a list of requirements. Pls.' Ex. E § 2.18. The purported subcontracts at issue here did not meet the CBA's express requirement for written notice to the EJAB "in advance of the beginning of the work." Nor did the defendants' arrangements require the subcontractor—in this case MPEA—to "supply separate supervision . . . for the Employees working in the area defined by the scope of work." *Id.* Rather, it appears to be undisputed that Freeman and GES directed and managed the work of the pool members.

Defendants' contention that their arrangement passes muster because all of them were aware of what was going on ignores the fact that the CBA's requirements for subcontracts are not there just for the benefit of particular employers. The CBA does not involve just McCormick Place; it is an industry-wide agreement to which numerous employers have subscribed. The CBA leaves it up to a joint employer-union board, the EJAB, to approve or deny any particular subcontract. Presumably at least part of the reason for this is to avoid special deals or favoritism involving particular employers. But the defendants completely bypassed the EJAB process when they entered into the side letters.

Defendants say, and the Court agrees, that to interpret a collective bargaining agreement "it is necessary to consider . . . the practice, usage and custom pertaining to . . . such agreements." *Transp. -Commc'n Employees Union v. Union Pac. R.R.*, 385 U.S. 157, 161 (1967). But defendants have not offered any evidence that would permit a reasonable jury to find that what they did fits within a practice or custom of bypassing

the CBA's subcontracting requirements.  Rather, based on the record that is before the Court, this situation is *sui generis*.  Given this record, no reasonable jury could conclude that defendants entered into a valid subcontract arrangement within the meaning of the CBA.  The Court therefore finds in plaintiffs' favor on this point.

Defendants also argue that their later arrangements involved permissible joint ventures.  They did not comply with the plain terms of the CBA in this regard either. Among other things, the joint venture provision in the CBA, like the subcontracting provision, requires advance notice to the EJAB.  *See id.* § 2.19.  On the joint venture issue, however, defendants have provided some evidence—though it is rather scant—of a historical practice of tolerating undisclosed joint ventures.  *See* Defs.' Ex. 6 (Allen Decl.) ¶¶ 9-11.[4]  Under the circumstances, neither side is entitled to summary judgment on the joint venture point.

### 3.    Apparent authority

Defendants argue in the alternative that Freeman and GES did not breach the CBA because they reasonably relied on the union's "apparent authority" to enter into the side letters, which stated that "IBEW hereby agrees that nothing herein violates the Principal Agreement."  Pls.' Ex. 13.  "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that

---

[4] The Court characterizes the evidence as "scant" largely because Allen's affidavit only describes a single specific example of a joint venture, one that predates the arrangement in this case by twenty years.  And his affidavit says precious little about whether this evidently unapproved arrangement was actually tolerated by the union or by the EJAB.  The Court also notes that Allen's affidavit contains no similar evidence regarding subcontracts, as opposed to joint ventures.

belief is traceable to the principal's manifestations."  Restatement (Third) of Agency §
2.03 (2006).

There is certainly room for the doctrine of apparent authority in the union-
employer context.  *See, e.g., Moreau v. Local Union No. 247, Int'l Bhd. of Firemen and
Oilers, AFL-CIO*, 851 F.2d 516 (1st Cir. 1988); *Cent. States Se. and Sw. Areas Pension
Fund v. Kraftco, Inc.*, 799 F.2d 1098 (6th Cir. 1986).  But it is not enough for defendants
to cite a legal principle; they must offer evidence that supports its application.  Among
other things, defendants cite no "manifestations" by the union that would have given
Freeman or GES a reasonable belief that Tim Foley, the union local's business
manager at the time, had authority to make side deals with particular employers,
particularly when the side deal essentially abrogated a term of the collectively-bargained
master agreement (the CBA) and did so by bypassing the master agreement's
established procedure for approving such arrangements.  Defendants are not entitled to
summary judgment on this basis.

**B.       Duty of fair representation**

"A union breaches the duty of fair representation only if its actions are arbitrary,
discriminatory, or in bad faith."  *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369
(7th Cir. 2003) (citing *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).  "Each of these
possibilities must be considered separately in determining whether or not a breach has
been established."  *Id.*  "Whether or not a union's actions are discriminatory or in bad
faith calls for a subjective inquiry and requires proof that the union acted (or failed to
act) due to an improper motive."  *Id.*  In contrast, whether a union has acted arbitrarily
calls for an objective inquiry.  "[A] union's actions are considered arbitrary only if 'in light

of the factual and legal landscape,' these actions are 'so far outside a wide range of reasonableness as to be irrational.'" *Garcia v. Zenith Elec. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). In this sense, "the test for determining whether particular conduct is arbitrary can be quite forgiving." *Id.*

Plaintiffs argue that the union acted discriminatorily, in bad faith, and arbitrarily by entering into arrangements that required Freeman and GES to breach the CBA and lay off the plaintiffs and by concealing from plaintiffs the side letters and utility service agreement setting forth these arrangements—by not seeking their ratification by the union's members and actively withholding knowledge of the arrangements. The improper motive that plaintiffs attribute to the union is the intent to protect and advance the interests of "the politically connected electricians in the MPEA pool." Pls.' Reply at 3. Plaintiffs offer this allegation of motive in opposition to defendants' cross-motion, but they do not seek summary judgment on that ground. *Id.* Rather, plaintiffs are eligible for summary judgment only on the basis that the union behaved arbitrarily.

Defendants contend that at least one of the reasons why they did not seek union members' ratification of the side letters was that they did not believe that the letters amended the CBA. Defendants also characterize as vague and unreliable testimony by one of the plaintiffs that the union's business manager said at a union meeting that he did not know anything about the new arrangements, and they say this does not reflect concealment of those arrangements. Pls.' Ex. P. at 159-60. Defendants contend that plaintiffs have failed to establish the existence of favoritism, dismissing alleged connections among pool members and defendants (especially the union) as obsolete or

attenuated given when certain union members last held office or passed away.  Defs.'

Reply at 6-7.

> Simply put, while these Pool electricians may have had connections to
> officers or employees of Local 134 in the '80's, '90's and early 2000's, this
> is not evidence that, in 2011, [the union] sought to protect their jobs
> because of the relationship with former Local 134 officers and employees
> when entering into the ISLs.

*Id.*  Defendants argue that the union entered into the new arrangements to ensure that

Freeman and GES could provide adequate services to McCormick Place vendors,

which would increase the chances of the vendors' return to the venue and secure jobs

for union members in the future.  Defendants state that "[n]ot only was the Chicago

trade show industry hanging in the balance, but hundreds of jobs for Local 134

electricians who rely on trade show work at McCormick Place to make ends meet were

in jeopardy."  Defs.' Opening Br. at 24.

Both the plaintiffs and defendants have offered evidence supporting their

contentions.  Plaintiffs point to the fact that the CBA allows employers to make specialty

calls (request only electricians possessing a specific skill) and argue that for this reason,

the defendants did not actually need a separate arrangement to obtain electricians who

had the requisite ability to work McCormick Place tradeshows—thus suggesting that

their proffered reason is pretextual.  Pls.' Ex. E § 4.17.  Plaintiffs concede that Freeman

had trouble obtaining employees with appropriate rigging experience despite the

availability of specialty calls, but they also cite testimony by a Freeman representative

that the union failed to respond to the company's inquiry about using that sort of a call.

Pls.' Ex. C at 21.  Based on this evidence, plaintiffs argue that Freeman's trouble hiring

experienced employees did not stem from a lack of experienced electricians outside of the McCormick Place pool.

Plaintiffs maintain that any problems that defendants have identified as resulting from their inability to obtain workers with appropriate skills using the neutral referral procedure concerned only a single tradeshow involving GES, making this a relatively insignificant consideration in the scheme of things. Plaintiffs also offer Freeman and GES's eventual reversion to the neutral referral procedure as additional evidence that the challenged arrangements were not actually needed to supply McCormick Place vendors adequate services.

To contest defendants' contention that they lacked an improper motive, plaintiffs identify at least twenty members of the McCormick Place pool who were related to a union officer, business agent, or referral agent; related to another MPEA employee; volunteered for a campaign for union office; or were referred to the McCormick Place pool by someone belonging to one of the above groups. Pls.' Exs. G at 25, 28-30, 33, 35-39, V, and W.

For their part, defendants offer testimony by the union's business manager that pool members were most likely selected based on ability, arguing this reflects that the McCormick Place pool included the electricians with the requisite skills and experience to staff the tradeshows. Defs.' Ex 7 at 12. Defendants also cite a declaration by the union's referral hall agent stating that "[m]any electricians on the out of work list choose to pass up a McCormick Place call or show call because they do not want to perform trade show electrical work which is different from the electrical work performed at a traditional construction sight [sic]." Defs.' Ex. 1 ¶ 4. The declaration documented

instances where this occurred, including one where at least 1,600 electricians opted not to take Freeman's call for a McCormick Place tradeshow. *Id.* ¶¶ 4-5.

Defendants also cite the testimony of GES's general manager that a "lack of experience from hall electricians dealing with the way things are done at McCormick Place" caused a live wire to shock an auto show exhibitor, the shorting out of an exhibitor's computers, dropping a panel from a catwalk, incorrect wiring of an exhibitors' machines, and shorting out of an exhibitor's coffeemakers, prompting that exhibitor not to return the following year. Defs.' Ex. 11 at 19-20. GES's general manager also testified that the work took longer than anticipated, forcing the company to call more electricians. *Id.* at 21. The union's business manager stated that the costs of shows rose for these exact reasons. Defs.' Ex. 7 at 53. To account for why defendants eventually reverted to the neutral referral procedure, they offer the testimony of Freeman's director of electrical services describing pool members' unwillingness to follow Freeman's paperwork, installation, and other policies and to report issues occurring on the floor. Defs.' Ex. 12 at 70-71. The same Freeman representative also testified that the company had trouble obtaining a sufficient number of employees from the pool under the new arrangements. *Id.* at 72. Finally, the union's business manager expressly denied that electricians gained entry into the McCormick Place pool based on political or family connections. Defs.' Ex. 7 at 89-90.

The Court finds that there is a genuine dispute regarding material facts that precludes summary judgment for either party on the duty of fair representation claim. A reasonable jury could find that the specialty call mechanism would have met the defendants' hiring needs, leaving them without a viable legitimate explanation for

entering into the new arrangements. By contrast, a reasonable jury could credit GES's evidence that it needed the arrangements due to the accidents and problems that it experienced under the hiring hall procedure. There is likewise conflicting evidence on the claim of improper motive. For these reasons, the Court denies both sides' motions for summary judgment on plaintiffs' duty of fair representation claim against the union. (For this reason, issues raised by the parties regarding the appropriate relief are premature.)

## Conclusion

For the foregoing reasons, the Court denies plaintiffs' motion and defendants' cross-motions for summary judgment but finds, pursuant to Federal Rule of Civil Procedure 56(g), that plaintiffs have established that the "subcontracting" provision of the collective bargaining agreement does not apply to the arrangements that plaintiffs challenged in this case. A status hearing is set for August 5, 2014 at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 31, 2014